UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESTATE OF TYLER S. RUSHING, et al., <br><br> Plaintiffs, <br><br> v. <br><br> AG PRIVATE PROTECTION, INC., et al., <br><br> Defendants. | No. 2:18-cv-01692-MCE-AC <br><br> **MEMORANDUM AND ORDER** |

By way of this action, Plaintiffs seek to recover for injuries sustained as a result of a fatal altercation between Tyler S. Rushing ("Decedent")[1] and the following groups of Defendants: (1) AG Security Protection, Inc. ("AG"), and AG security guard and supervisor Edgar Sanchez ("Sanchez") (collectively the "Security Defendants"); (2) the City of Chico (the "City"), the Chico Police Department ("Chico PD"), Chico PD Sergeant Scott Ruppel, and Officers Cedric Schwyzer, Alex Fliehr, and Jeremy Gagnebin (collectively the "City Defendants"); and (3) the County of Butte (the "County"), the Butte County Sheriff's Office ("Sheriff's Office"), and Deputy Sheriff Ian Dickerson (collectively the "County Defendants"). Presently before the Court are three separate Motions for

///

---

[1] Plaintiffs are Decedent's estate and his parents, Scott K. Rushing and Paula L. Rushing.

1

Summary Judgment brought by each group of Defendants. ECF Nos. 37, 45, 38.[2] For the following reasons, those Motions are GRANTED.[3]

## BACKGROUND[4]

At approximately 9:18 p.m. on the evening of July 23, 2017, Officer Fliehr was dispatched to respond to a report of a "suspicious person" in an alley behind a commercial building in Chico. Fliehr was informed that the person was loading a shopping cart with items from a donation bin and appeared to be fashioning a spear out of an object. Upon arriving at the scene, Fliehr observed a person holding what appeared to be curtain rods. Fliehr asked the individual to put down the objects. The individual responded in the affirmative but then immediately ran away. Having no basis on which to detain the subject, Fliehr called off the search and moved on to other calls.

Approximately an hour and a half later, at 10:37 p.m., a motion sensor inside the Mid Valley Title Company ("Mid Valley") employee breakroom was tripped, prompting a call from the alarm company to AG. Sanchez responded to the call. He parked approximately one half of a block away, turned on his body camera, unholstered his gun to utilize the flashlight attachment, and began to approach the rear of Mid Valley where there was a fenced-in patio area surrounded by bushes. Sanchez noticed a breach in the patio's fence, as though someone had pried it from the post, and he used that gap to enter the patio. Upon further inspection, Sanchez saw glass from a broken window, which he reported to AG with a further request that AG inform Chico PD.

///

---

[2] The Court previously denied a Motion for Summary Adjudication (ECF No. 23) brought by Plaintiffs as to the discrete issue of whether one Defendant, Officer Fliehr, used excessive force when he tasered Decedent after Decedent had been shot. ECF No. 35.

[3] Because oral argument would not have been of material assistance, the Court ordered this matter submitted on the briefs. See E.D. Cal. Local R. 230(g).

[4] The following facts are an amalgamation taken, mostly verbatim, from all of the parties' briefs. Events were also recorded on body cameras worn by Sanchez, Schwyzer, Fliehr, and Gagnebin as well.

As he began to exit the patio, Sanchez observed a person's legs obstructed behind a bush.  Within seconds, Decedent had ambushed him, stabbing him at least two times.  According to Sanchez, because he feared for his life, he shot Decedent in the chest in self-defense.  Decedent thereafter ran away, yelling obscenities.  Sanchez reported the shooting to AG's dispatch, stating:  "Shots fired. Shot fired," and reporting "Somebody's been shot. I shot him."  Sanchez did issue a verbal "Stop" order prior to being attacked by Decedent, and after the incident it was discovered that Decedent had actually stabbed Sanchez with a glass pot that purportedly had broken so the handles made a "v" shape, resulting in a two-pronged makeshift weapon.

AG contacted Chico PD to relay the information.  In the meantime, Decedent entered Mid Valley and barricaded himself inside a restroom.

When Chico PD officers, including Sergeant Ruppel and Officer Fliehr, responded to Mid Valley, they found Sanchez in the enclosed outdoor patio.[5]  Sanchez informed Ruppel that a subject had jumped out of the bushes and stabbed him in the arm and that he had feared for his life and fired at the suspect.  Based on the description provided, Fliehr believed that the suspect may have been the same subject he encountered earlier in the evening.

Ruppel and other officers went to the front entrance of the building and noticed a great deal of blood both dripped and smeared on the inside of the glass entrance doors, leading the officers to believe that the suspect was inside the business.  It was approximately 11:11 p.m. when the officers went back to the patio area and entered the building through a sliding glass door leading to an employee breakroom where large blood drops and more smears were seen.  Ruppel stepped out into the hallway adjacent to the breakroom and purportedly announced loudly, "Chico Police!  If you are in here, come out!"  From further inside the building, a voice responded, "Fuck you!  I've got a gun!"  Ruppel began to move out into the main part of the business while loudly stating, "We know you're hurt. We just want to get you some help at this point.  Just come out

---

[5] At some point, Officers Schwyzer and Gagnebin arrived as well.

and we'll deal with it . . . Hey, partner, we know you're hurt. We've got an ambulance waiting." Ruppel and other officers determined that the voice was coming from the women's bathroom inside the building. Officers checked other areas of the building to confirm that there were no other subjects present and noticed blood smears outlining a heart and peace sign were on a filing cabinet.

The City Defendants contend that Ruppel maintained nearly continuous pleas to Decedent in the bathroom until 11:49 p.m. During that time, Ruppel stated to Decedent, among other things:

> We want to get you help. The ambulance is right here. We'll get you the help you need. Partner, we just need you to come out . . . Step out where we can see your hands. If you need to, crawl out partner. Crawl out. Whatever happened, happened. You just got to deal with it now. We know you are hurt. We just want to get you some help at this point. Nobody else needs to get hurt. Not you or anyone else . . . Go ahead and step out. Just think about it. You know it is the right thing to do. We have medics waiting for you. You can make the right decision.

At approximately 11:24 p.m., officers could hear sounds such as metal objects hitting the floor inside the bathroom, along with other muffled thuds and crashes from inside. At approximately 11:36 p.m., loud snapping, thrashing, and a loud shattering could be heard coming from the bathroom as well. At various times, Decedent could also be heard moaning in pain.

In the meantime, at approximately 11:25 p.m., Dickerson was on patrol when he got a call from Chico PD requesting the assistance of a Butte County canine for a break-in at a closed Chico business. According to the County Defendants, Dickerson had been employed with the Sheriff's Department since approximately January 2015 after graduating from the Butte College Police Academy in January 2014. In May 2016, Dickerson was selected to the Sheriff's Office canine unit and was assigned a police canine named "Tig."

On this evening, Dickerson asked for and obtained approval from his field supervisor to assist Chico PD, retrieved Tig, and responded to the subject location. He

arrived at the site at approximately 11:40 p.m. and was informed that Decedent had barricaded himself in a bathroom. Dickerson was also purportedly informed that Decedent had stabbed a security guard, had been shot before entering the building and that, after entering, Decedent had at some point claimed he had a gun.

Dickerson and Tig entered the building at approximately 11:43 p.m. According to Dickerson, he observed approximately six Chico PD officers inside. He also noticed blood had been smeared at multiple locations throughout the business and saw large drops of blood on the ground. Dickerson spoke with Ruppel, who indicated to Dickerson where Decedent was barricaded in the bathroom. It appeared to Dickerson that Decedent's activity level was slowing.

After Dickerson entered the building at the subject location, Defendants contend that Ruppel stated loudly to Decedent: "Come on out sir, we just want to…come on out, we will help you. Step on out partner, we got medics waiting. You know we are not going anywhere. We just need you to come out sir so everything goes easy." Ruppel continued: "Sir, step on out, make it easy, okay? Sir, just come out, man. Just step on out, do it the easy way." As Ruppel pleaded with Decedent, Dickerson and Tig moved toward the bathroom. When Dickerson and Tig were approximately 15-20 feet from the bathroom, Dickerson stated loudly to Decedent: "Listen . . . Butte County Sheriff's Office with a canine. I need you to come out. My dog will find you and he is going to bite you. If you come out now you won't get hurt." Hearing no response from Decedent, Dickerson further stated: "Butte County Sheriff's Office with a canine. I need you to come out before my dog finds you and he will bite you." Decedent did not respond to either command and remained in the bathroom. Ruppel again pleaded with Decedent to come out: "Come on out man let's get you some help. Do it the easy way. We will get you some help. Fire is waiting."

Eventually observing that blood-tinged water was seeping out from under the bathroom door and that Decedent's activity had slowed, indicating that he was possibly "down" and succumbing to his wounds, the officers at the scene devised a plan to move

5

1  forward.  Chico PD officers would strike the backside of the bathroom wall in an attempt
2  to distract Decedent.  Ruppel would ram the door open, purportedly clearing the way for
3  Schwyzer to enter the room with a ballistic shield as cover for the other entering officers.
4  Schwyzer would be followed by Dickerson and Tig, Gagnebin with a less-lethal beanbag
5  shotgun, and then Ruppel with his handgun as the lethal option.  Medical personnel
6  were purportedly staged and ready to render aid to Decedent.

       According to Defendants, in implementation, at approximately 11:50 p.m., the plan unfolded as follows:  Ruppel hit the door with the battering ram but the door was pushed back and he had to hit it a second time.  Schwyzer moved in before everyone else holding the ballistic shield, saw no one in the main area of the bathroom, and realized that Decedent was behind the bathroom door.  He then tried to use the shield to pin Decedent between the door and the adjacent wall.  Dickerson and Ruppel stepped to the threshold and attempted to put their weight against the door to trap Decedent.  They allegedly saw something in Decedent's right hand come out from behind the door and slash at Schwyzer's legs.  That object turned out to be a large porcelain shard (8" x 10") that Decedent had broken off the bathroom toilet.

       Because the bathroom floor was wet and slippery, officers had difficulty keeping Decedent behind the door as he was pushing forcefully back against them.  Schwyzer then saw Decedent swing the porcelain shard over the top of the shield.  Decedent hit Schwyzer in his forehead.  The blow stunned Schwyzer and sent him stumbling back away from Decedent.

       Schwyzer saw his own blood dripping from the wound and let out an expletive.  At that point Dickerson pulled his dog into the room by its leash and commanded him to bite Decedent, who was still behind the door.[6]  Decedent continued to struggle and began making his way out from behind the door despite the officers' attempts to pin him.

---

[6] For his part, Dickerson had seen the floor covered in bloody water, and although he did not initially see Decedent, Dickerson very shortly thereafter saw him behind the bathroom door.  Dickerson witnessed Decedent strike Schwyzer with an object, causing him to stumble back.  Although Dickerson commanded Tig to bite Decedent, the canine was unable to apprehend him.

The officers nonetheless continued to attempt to control and grab Decedent, who was also himself wet and slippery. Ruppel grabbed Decedent by the neck and tried to bring him down to the floor, hoping that someone else could grab Decedent's arms. According to Dickerson, he was able to grab Decedent's right wrist, but, within seconds, the City Defendants contend, Decedent used his left hand to wield a ballpoint pen in a stabbing motion and stabbed Ruppel in the neck within one-half inch of his carotid artery. Ruppel released his hold on Decedent's neck, immediately grabbed his own neck with his left hand to cover his wound, and reached for his gun. He put the gun within about an inch of Rushing's chest and fired. According to Defendants, Ruppel knew that Schwyzer was to his left, Dickerson was to his right, and that was the safest way for him to prevent anyone else from being stabbed by Decedent.

Defendants contend that, after being shot, Decedent turned away from Ruppel but did not fall to the ground. Ruppel then fired a second shot because Decedent was still up and moving and continued to pose a threat to him and the other officers, in part, Ruppel believed, because he never saw the ballpoint pen drop from Decedent's hand. At some point therein, Dickerson let go of Decedent's arm. Upon being shot the second time, Decedent fell to the floor facing away from the officers with one hand outstretched and one hand concealed under his body. Dickerson and Tig left the bathroom.

Fliehr states he entered the bathroom as Ruppel fired the second shot, and he witnessed, among other things, Decedent stab Ruppel in the neck with the pen, blood going down Schwyzer's face, Ruppel discharged his firearm at Decedent twice in rapid succession, and Decedent fall to the floor facing away from the officers with one hand outstretched and one hand concealed under his body. According to Fliehr, he saw Decedent "flinch" and observed Decedent's body continue to move slightly after he fell to the ground. Plaintiffs disagree and contend that Decedent was motionless, which they also aver is supported by the body camera footage. Regardless, given Fliehr's purported observations, he immediately announced to the other officers at the scene that Decedent was still moving, was not dead, and was not handcuffed. Believing it is

7

common for suspects to feign being unconscious or otherwise incapacitated, Fliehr thus deployed his taser, after which Decedent was handcuffed. Paramedics provided medical assistance, but, at approximately 11:59 p.m., Decedent was pronounced dead at the scene.

Plaintiffs initiated this action to recover for injuries sustained as a result of the foregoing events. By way of the operative Complaint (ECF No. 1), they allege the following causes of action: (1) Use of Unreasonable Force under the Fourth and Fourteenth Amendments to the United States Constitution against Defendants Sanchez, Ruppel, Schwyzer, Fliehr, Gagnebin, and Dickerson; (2) Interference with the Right of Familial Association, Companionship, and Society under the Fourteenth Amendment to the United States Constitution against Defendants Sanchez, Ruppel, Schwyzer, Fliehr, Gagnebin, and Dickerson; (3) violation of the Right of Association, Companionship, and Society under the First and Fourteenth Amendments to the United States Constitution against Defendants Sanchez, Ruppel, Schwyzer, Fliehr, Gagnebin, and Dickerson; (4) Use of Unreasonable Force under Article I, § 13 of the California Constitution and California Government Code §§ 815.2(a) and 820(a) against all Defendants; (5) violation of California's Bane Act under California Civil Code § 52.1(b), California Code of Civil Procedure § 377.30, and California Government Code §§ 815.2(a) and 820(a) against all Defendants; (6) Assault and Battery under California law against all Defendants; (7) Negligence under California law against all Defendants; and (8) Wrongful Death under California law against all Defendants.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v.

///

8

Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.

   Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995).  The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

   In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

   In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and

Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987).  The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.  In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original).  As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.  Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. at 587.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

## ANALYSIS

This case presents a unique situation where the material facts underlying Plaintiffs' claims were captured on four separate body cameras.  The Court has watched all of the video and listened to all of the audio in excess of ten times.  Having painstakingly reviewed that real-time evidence over many hours, the Court now

///

concludes that Defendants' Motions must all be granted because each Defendant acted imminently and reasonably under the circumstances.[7]

### A. Security Defendants' Motion for Summary Judgment

The Security Defendants argue they are entitled to summary judgment, or in the alternative summary adjudication, of Plaintiffs' claims as follows: (1) Plaintiffs' first three causes of action arising under the federal Constitution and the unreasonable force claim arising under the California Constitution all fail as to these Defendants because Sanchez did not act under color of state law, did not use unreasonable force, and acted in self-defense; (2) Plaintiffs' Bane Act cause of action fails because it does not apply where used to enforce rights that apply only to the state or its agents, Plaintiffs cannot show Sanchez used unreasonable force, and, regardless, Sanchez acted in self-defense as opposed to threat, intimidation, or coercion; and (3) Plaintiffs cannot succeed on their Assault and Battery, Negligence, or Wrongful Death causes of action because Sanchez acted in self-defense. In opposition, Plaintiffs do not oppose dismissal of the first five causes of action because discovery revealed that the Security Defendants' conduct does not qualify as state action. Pls.' Opp., ECF No. 56, at 4. Accordingly, the Security Defendants' Motion is GRANTED as to those causes of action. The Court thus turns to Plaintiffs' remaining common law claims against the Security Defendants.

According to the Security Defendants, Plaintiffs cannot succeed on their assault and battery, negligence, or wrongful death claims because they cannot show the requisite use of unreasonable force, especially when Sanchez acted in self-defense. More specifically, the Security Defendants contend that

> Plaintiffs will not produce an expert to testify regarding the incident directly between Rushing and Sanchez. Specifically, Plaintiffs will not provide expert testimony at the time Rushing ambushed and stabbed Sanchez, nor when Sanchez shot Rushing for fear of his own life. (Lawrence Decl. ¶¶ 16-22.) Sanchez truly believed he was being stabbed by a knife and shot Rushing to protect himself from imminent threat of life.

---

[7] The Court determines below that Defendants' reasonable behavior justifies granting each of their motions in their entirety on the merits. Regardless, at the very least the federal claims are foreclosed and, in the alternative, the Court declines to exercise supplemental jurisdiction over the state claims.

> The undisputed facts support this as evidenced by Sanchez' body camera, which captured the ambush and attack by Rushing.
>
> Therefore, the undisputed material facts support, by a preponderance of the evidence, Sanchez feared for his life and used reasonable force – in that moment – to protect himself from the imminent harm being caused by Rushing.

Security Defs. Mot., ECF No. 45-1, at 18. They are correct. Sanchez did not shoot wildly or without provocation. He shot Decedent only after he himself had been ambushed, stabbed at least twice with an unknown object and while still in the throes of a late-night attack. Defendants' Motion is thus GRANTED as to these final three causes of action as well.[8]

### B. City and County Defendants' Motions for Summary Judgment

The City Defendants move for summary judgment based on the following arguments: (1) the individual officers are entitled to judgment on the first cause of action because the amount of force they utilized was objectively reasonable under Graham v. Connor, 490 U.S. 386 (1989), and, regardless, the claim is barred by the doctrine of qualified immunity;[9] (2) the officers are entitled to judgment on the second cause of action because Plaintiffs cannot show the officers acted with purpose to harm and without regard to legitimate law enforcement objectives, and that claim is also barred by the doctrine of qualified immunity; (3) the third cause of action fails as duplicative of the second claim and because Plaintiffs have not alleged that their expressive association rights under the First Amendment have been violated; (4) Plaintiffs' fourth cause of action arising under the California Constitution fails because it does not provide for a

---

[8] Given that Plaintiffs have been unable to identify a viable claim against Sanchez, they have also failed to identify any basis on which AG can be held liable (whether directly or indirectly). Sanchez did nothing actionable that will support either vicarious liability or liability arising from a theory "related to negligent hire, retention, training, and/or supervision of Defendant Sanchez." Pls.' Opp., ECF No. 56, at 12.

[9] The Court is cognizant that Plaintiffs contend Defendants failed to adequately allege their qualified immunity defenses. Although the Court need not reach the issue of qualified immunity to dispose of Plaintiffs' claims, it nonetheless finds those defenses properly alleged and Plaintiffs' argument on this point is thus rejected.

private right of action; (5) each of Plaintiffs' last four causes of action fail because Plaintiffs cannot show the requisite use of unreasonable force.

The County Defendants argue they are entitled to summary judgment because of the following arguments: (1) as to Plaintiffs' first cause of action, Dickerson's actions were objectively reasonable and he is entitled to qualified immunity in any event; (2) Plaintiffs' second cause of action fails since Dickerson's conduct does not "shock the conscience"; (3) Plaintiffs' third cause of action fails because, again, Dickerson's conduct was objectively reasonable; (4) their fourth cause of action fails because the California Constitution does not allow for a private right of action and, regardless, Dickerson's actions were reasonable; (5) Plaintiffs' sixth through eighth causes of action fail given Dickerson's reasonable conduct; and (8) the eighth cause of action fails as to these Defendants for the additional reason that Dickerson's conduct was not a substantial factor in Decedent's death.

Although there are some ancillary issues the Court will address in footnotes, the bulk of these arguments fail because the Court finds as a matter of law that each Defendant acted entirely reasonably.[10]  As indicated above, this Court has deliberated at length with regard to this case and has not rushed any aspect of its analysis. The Court is very familiar with the applicable law and intimately acquainted with the material facts here.  Finally, this Court firmly believes that officers and first responders should be held to the highest standards that we as a society choose to set and that they should be trained to respond with discipline and civility to every call.  As continuously reiterated by the United States Supreme Court, however, this high standard has never demanded perfection and certainly has not permitted courts to act as armchair quarterbacks.  See

---

[10] For example, as to these additional arguments, the City Defendants contend that Plaintiffs' California constitutional claim necessarily fails because Article I, § 13 does not provide a private cause of action. "Federal district courts in California are split on this question." Estate of Osuna v. Cty. of Stanislaus, 392 F. Supp. 3d 1162, 1178 (E.D. Cal. 2019).  This Court has previously held that no private cause of action is conferred by this section.  See Cabral v. Cty. of Glenn, 624 F. Supp. 2d 1184, 1196 (E.D. Cal. 2009); Buzayan v. City of Davis Police Dept., Case No. 2:06-cv-01576-MCE-DAD, 2007 WL 2288334, at *8-9 (E.D. Cal. Aug. 8, 2007).  The City Defendants' Motion for Summary Judgment on this claim is thus GRANTED regardless of the resolution of the use of force questions.

Graham, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").

In this case, Defendants were confronted with an individual that, very sadly and for whatever reasons, had determined to attack them repeatedly with potentially lethal makeshift weapons, even after he himself sustained a grave injury. Officers responded in a measured manner, deciding to breach the bathroom only after it became evident that time was of the essence in providing Decedent critical medical care. They utilized less lethal options initially, including releasing the canine, but Decedent escalated things even further when he stabbed them with a pen and a porcelain shard he had broken off the toilet. Given the close quarters and the violent welcome officers received, it is no wonder that Sergeant Ruppel felt it necessary to utilize deadly force. It is also no wonder that officers were reluctant to believe that Decedent had finally been incapacitated when they opted to taze him in order to apply the handcuffs. The Court is at a loss to see how much more reasonably these officers could have reacted.

Plaintiffs' arguments to the contrary demand much more than reasonableness and would instead require nothing short of clairvoyance. For example, there is no way that these officers in this rapidly evolving situation could have known whether Decedent had finally been incapacitated as he lay on the floor or whether he was feigning as much so he could ambush them yet again. Nor could Sergeant Ruppel have been expected to perceive whether Decedent might have been incapacitated after the first gunshot, especially since Decedent had already sustained a gunshot wound earlier in the evening that did little to slow his attacks. In addition, it doesn't matter why Decedent kept fighting the officers after they breached the door, whether it was because Decedent was afraid of the canine or he actually intended to kill them. The fact is that Decedent utilized deadly force against the officers, leaving them few options in response.

To that end, while these officers might have hoped Decedent was finished resisting, at the end of the day, they were not required to employ that hope as a course

of action or to rely on hope to get them home.  Given Decedent's track record that evening, where he had stabbed a security guard and not one, but two officers, and where he had violently attacked the others in his vicinity, Defendants' restrained and methodical response is precisely what one would expect to see from its civil servants.[11]

**CONCLUSION**

For the reasons set forth above, Defendants' Motions for Summary Judgment (ECF Nos. 37, 45, 38) are GRANTED, and the Clerk of the Court is directed to enter judgment in their favor and to close the case.

IT IS SO ORDERED.

Dated:  July 22, 2020

_____
MORRISON C. ENGLAND, JR
SENIOR UNITED STATES DISTRICT JUDGE

---

[11] Given the Court's determination that Defendants use of force was reasonable under the circumstances, it need not determine the appropriate standard applicable to Plaintiffs' familial association claims. Whether the standard is "deliberate indifference" or "with purpose to harm," neither is met here.